## ANDERSON vs. FOULKE.—June, 1828.

Where land was sold under a decree, and the sale, after opposition by the purchaser, was ratified; but the trustee received neither notes, nor bonds, for the payment of the purchase money; and the period for payment having expired, the chancellor ordered the purchaser, to pay to the trustee, or bring into court, the amount of the purchase money, and interest, before a given day, or show good cause to the contrary.   The purchaser having failed to comply, the chancellor then ordered an attachment against him, to enforce obedience to his first order.   On appeal—*Held,* by the appellate court, that under the circumstances of this case, the chancellor had a right to adopt the proceeding to which he resorted.

A trustee having sold lands by order of the court of chancery, and reported his proceedings to that tribunal, where after objections taken thereto by the purchaser, they were ratified, and the ratification, on appeal, being sanctioned by the appellate court, it is no longer competent for such purchaser to contest the propriety or validity of that sale, nor to object, that he was not reported in the usual way to the court of chancery, as the purchaser of the property sold.

Where a tract of land is sold, as containing a given quantity of acres, and it is discovered that less is included than was conceived at the time of the sale, a deduction will be made, unless the deficiency shall be such as would have prevented the contract, if known at the time of the purchase; that is, the deficiency appearing to be in that part, which was the chief inducement to purchase.   Per *Johnson,* Chan.

If a trustee, who is directed by a decree to sell a tract of land entire, and at public sale, should sell it at private sale, and in parcels, or in any other manner different from the mode prescribed, and report satisfactory reasons for doing so, and no objection is made, the sale may be ratified.  Per *Bland,* Chan.

If there should be made to appear, either before or after a sale has been ratified, any injurious mistake, misrepresentation, or fraud, the biddings will be opened, the reported sale rejected, or the order of ratification rescinded, and the property again sent into the market, and resold.   *Ib.*

To all sales under the orders and decrees of the court of chancery the rule *caveat emptor* has been applied.   *Ib.*

APPEAL from the Court of Chancery.  At March term 1822, a decree of the court of chancery was passed in a cause, then depending in that court, between *Andrews* and *Williams,* complainants, against *Asher Foulke,* and others, defendants, directing that the real estate of *Stephen Scotton,* deceased, or so much thereof as should be necessary, be sold for the payment of the claim of the complainants, and of such other debts of the deceased as should be established to the satisfaction of the chancellor,   *Asher Foulke* was appointed trustee to make the sale, and directed to give bond, &c. and after giving notice, &c.

proceed to sell the tract of land mentioned in the proceedings, either entire or in parcels as he should think fit, upon the following terms, to wit: One third part of the purchase money to be paid at the time of the sale, or on ratification thereof by the chancellor; one other third part of the purchase money to be paid in twelve months from the day of sale, and the remaining third part to be paid in two years from the day of sale. For the payment of the two last instalments with interest, notes or bonds with security, to be approved by the trustee, to be given. The trustee after the sale, to return to the court a full and particular account of his proceedings under the decree, with an affidavit of the truth thereof, &c. The trustee reported that "in pursuance of a decree issuing out of the court of chancery on the first of April last, by said decree the subscriber was appointed trustee to sell a certain tract of land, late the property of *Stephen Scotton*, deceased. After having given bond, and advertising the terms of sale in two public papers, agreeably to the directions of the said decree, a public sale was held on the 23d of July, where there was no more bid than eight dollars per acre, which was not thought sufficient to authorise a sale; and have since sold it on the 28th day of August 1822, *as may be made appear*, for eleven dollars per acre. The land supposed to contain 140 acres." Signed and affirmed to by *Asher Foulke*, on the 29th of August 1822. The chancellor on the same day passed an order that the sale above reported be ratified and confirmed on or before the 10th of November then next, provided a copy of the order was published, &c. before the 10th of October then next. On the 9th of October 1822, *Samuel Anderson* (the now appellant,) exhibited his petition to the chancellor, in which he stated that *Foulke* was, by a decree of the court of chancery passed on the 5th of April 1822, appointed trustee for making sale of the real estate of *Stephen Scotton*. That the petitioner contracted with *Foulke* for the purchase of a tract of land called *Duvall's Delight*, supposed to contain 140 acres, at and for the sum of $11 per acre, and by the trustee's report was returned as the purchaser. That during the treaty between the petitioner and *Foulke* for the purchase of the said land, *Foulke* represented a *piece of woodland* on the north side of the said tract of land, as a part

of the said tract called *Duvall's Delight*. That the petitioner had been informed and believed, that the lines of several neighbouring tracts of land run into and took off a great part of the said woodland. That the location of the said woodland *was the principal inducement to his purchasing the said tract, and is material and necessary to the possession and enjoyment* of the said tract of land. The petitioner, therefore, prayed that the chancellor would not ratify and confirm the sale. as made and reported by the trustee. The chancellor fixed a day for hearing the petition, on a copy of his order being served on the trustee. He also ordered that the depositions of witnesses, taken before a justice of the peace on three days notice thereof to the parties, be read in evidence at the hearing. On the 4th of December 1822, the trustee by his answer to the petition, stated, that he never showed to the petitioner the outlines of the part of *Duvall's Delight* of the estate of *Stephen Scotton*, and that the petitioner knew the outlines of the said tract as well as the trustee did. That on the day on which the petitioner contracted with the trustee for part of *Duvall's Delight*, the estate of the said *Scotton*, and entered into a written agreement with the trustee for the purchase of and payment for the same, (as by the agreement exhibited would appear,) *Beale Duvall* was surveying his part of *Duvall's Delight*, on which the estate of said *Scotton* binds in part, and the lines of said *Duvall's* part of *Duvall's Delight*, on which *Scotton's* estate binds, were shown to the petitioner by the surveyor of the county, and others. The petitioner did not for the time, nor for a long time after, object to the running of *Duvall's* part of *Duvall's Delight*, as would appear by the depositions of certain witnesses exhibited. That there is no timber land, and but a small quantity of brush-wood on *Scotton's* part of *Duvall's Delight*, adjoining the said *Duvall's* part of the said tract; and that no other part of the outlines of the said part of the tract, the estate of *Scotton*, had been sold to the petitioner. Nor did the trustee believe that any person had, since the petitioner's contract with the trustee, surveyed the same for the petitioner; that if the petitioner had acquired any new information of the location of the estate of *Scotton*, he might have obtained the same

information (independently of the trustee,) previous to his contract for the purchase.

The trustee exhibited with his answer the depositions of sundry witnesses, and the agreement entered into with him by the petitioner on the 28th of August 1822, stating that *Foulke*, the trustee, had sold to *Anderson*, the petitioner, his heirs and assigns, "all that tract of land, late the property of *S. Scotton*, deceased, supposed to contain one hundred and forty acres, be it more or less, at eleven dollars per acre; he the said *Anderson* is to pay one third of the purchase money down, and the remainder in two equal annual instalments, with interest; for which notes are to be given with approved security, and when paid *Foulke* is to make and execute a title or deed to him the said *Anderson*, his heirs and assigns, for ever."

The petitioner also exhibited the depositions of sundry witnesses, taken in pursuance of the order of the chancellor. A survey of the land sold, and other adjoining lands, was made under the order of the chancellor, by the surveyor of the county, and a plot thereof returned.

JOHNSON, Chancellor, (March term 1823.) It is alleged by the petitioner, that *Asher Foulke*, the trustee under a decree for the sale of the real estate of *Stephen Scotton*, sold to the petitioner part of a tract of land called *Duvall's Delight*, supposed to contain 140 acres, at eleven dollars per acre; "that at the time of the sale, the trustee represented a piece of woodland on the north side of the said tract of land, as part of the said tract called *Duvall's Delight;*" that he believes, "that the lines of several neighbouring tracts of land run into and take off a great part of the woodland;" and that the "woodland was the principal inducement to his purchasing." As the property did not, according to the allegations contained in the petition, correspond with the representation made by the trustee, it is prayed that the sale may be set aside or annulled.

Preparatory to a decision, an order passed for laying down the land that was sold, as well as any other land that might be deemed by the parties necessary for the illustration of the matter in controversy.

On examining the plot returned by the surveyor, it appears that the trustee has laid down the land which he sold to the p

titioner, and this location is not counterlocated, and, therefore, admitted to be the land purchased. The quantity is 141¾ acres, of which three roods are within the lines of a deed executed by *Charles Carroll* to *Humphrey Hogan*, on the 16th of July 1723.

It seems to appear that *Charles Carroll* was the owner of the whole of the tract of land, which was conveyed by him to different persons; and before it can be known whether the three roods are the property of those claiming under *Hogan*, or belonging to the estate of *Scotton*, it is necessary to see the other transfers; and even if *Hogan's* title is the eldest, yet a title to it may have been acquired by possession; for as it is laid down as part of the land sold, it is to be presumed *Scotton* was in possession at the time of his death.

Where a tract of land is sold, and it turns out to be materially variant from the representation, the contract may be set aside. Where a tract is sold as containing a given quantity of acres, when it is discovered that less is included than was conceived at the time of the sale, a deduction will be made, unless the deficiency shall be such as would have prevented the contract, if known at the time of the purchase; that is, the deficiency appearing to be in that part which was the chief inducement to purchase. But in this case, in every respect the petitioner has failed to support his allegations. He has not proved that the trustee represented to him, that he sold "a piece of woodland as part of *Duvall's Delight*," which is included in the lines of "neighbouring tracts." He has laid down no interfering tract whatever; nor if the right of the trustee to sell three roods did not exist, and it could not exist unless it was owned by *Scotton* at the time of his death, has he proved that those roods of land were the inducement to the purchase?

The sale made by the trustee is, therefore, ratified and confirmed, and the petition dismissed with costs.

From this order the petitioner appealed to this Court.

At June term 1825, no objections being made to the chancellor's order, it was *affirmed nisi.*

Afterwards, on the 12th of January 1826, *Foulke*, the trustee, (now appellee,) by his petition to the chancellor, after stat-

ing the several facts as herein before mentioned, stated that since the decision of the court of appeals on the said appeal, he called on *Anderson*, the purchaser, and informed him of the said decision, and served a copy thereof on him, and requested him to pay him, and comply with his engagements; but that instead of so doing, he utterly refused, &c. That the time of the payment of the last instalment had long since passed, and *Anderson* had not paid the purchase money. *Prayer* for an attachment of contempt, &c. On the 13th of January 1826, the chancellor passed an order that an attachment issue as prayed by the foregoing petition, returnable to the first day of March term then next. The attachment accordingly issued, and was served on *Anderson*, who appeared, and, by his answer to the petition, stating that on an examination of the proceedings in the original cause, it did not appear by the trustee's report, that the respondent was the purchaser of the land therein mentioned; and he was advised, that in consequence of the irregularity of the proceedings a good title to the premises could not be conveyed to him by the trustee. That he had not been put into possession of the land, and he believed the trustee could not give him possession, the same being in the occupation of a certain *Joseph Marriott*. He denied the statement of the petitioner that a copy of the decretal order of the court of appeals had been served on him. That he was unable to comply with the terms of the decree. That he was advised that the court of chancery had no power to give the petitioner the relief he asked.

The petitioner then prayed the chancellor that *Anderson* be committed to jail for the contempt of the court, by him committed in not having paid the money due by him on account of the land purchased by him from the petitioner, as trustee, &c.

BLAND, Chancellor, (17th of March 1826.) In this case the petition and representation of *Asher Foulke*, the trustee, and the answer of *Samuel Anderson*, after hearing counsel on both sides, were read and considered.

It does not sufficiently appear that *Anderson* has been called upon, under any order of this court. commanding him to pay to the trustee, or bring into this court, the sum of money,

which he, as purchaser, contracted to pay for the land sold to him, as mentioned in the proceedings; therefore, without intimating any opinion as to any other matter urged or suggested by the counsel on either side, the chancellor conceives that *Anderson* must be discharged from his present detention.—*Ordered*, that he discharged, &c. Also ordered, that he pay unto the trustee. or bring into court, the sum of $1540, together with interest thereon from the 28th of August 1822, until paid, or brought in, being the amount of the purchase money of the land sold to him, as in the proceedings mentioned, on the 17th of April next, or show good cause to the contrary; provided a copy of this order, together with a copy of the said petition of the trustee, filed on the 12th of January last, be served on the said *Anderson*, on or before the 25th instant.

On the 25th of March 1826, *Foulke*, the trustee, filed a copy of the order and petition above mentioned, with an affidavit of the service thereof on the said *Anderson*, on the 25th of March 1826.

BLAND, Chancellor, (May 12th, 1826.) This case came on to be heard on the order of the 17th of March last, by which the purchaser, *Samuel Anderson*, was commanded to pay the purchase money, or show cause why he should not be made to do so. The parties were heard by their counsel, and the proceedings have been read and considered.

This application has been assailed as a novelty—altogether without precedent here, and having few even of *English* origin, and those few of very late date, and long since our revolution. It has also been opposed upon the ground, that the parties interested can only obtain redress, if indeed they are really entitled to any, by a bill in equity or a suit at law; in which, as it is said, the whole case can be fully investigated, the rights of the parties conclusively established, and complete justice done to both.

The defence taken in this case, if sustainable in all its consequences, appears to be destructive of some of the most valuable and important powers of this court. Controverted points, arising between the court's trustee for the sale of property, and the purchaser, have frequently been brought before me, since I came

here; but in each instance they have been treated as insulated matters of mere practice, and have passed off in that way. This case has assumed a more grave aspect. I shall, therefore, now review the subject more at large, and upon general principles.

On considering the nature of sales under the authority of the court of chancery, the first inquiry which suggests itself is, who are the real parties to the contract? This very idea of a contract implies, that there is one party able and willing to contract, and another to be contracted with. It implies a perfect capacity and free will in each of the parties to the agreement. To a contract of sale, made under a decree of this court, neither of the litigating parties to the suit can be considered properly as the vendor; although they, with others, such as creditors, who may be allowed to come in afterwards, are very materially interested in the sale. The plaintiff cannot be considered as the vendor; because, oftener than otherwise, he has no title, and always states his inability to sell; and prays the court to decree, that a sale shall be made. The defendant cannot be the vendor; because he always positively refuses to part with his property unless forced, or sanctioned in doing so by the power of the court. If then neither of the litigating parties can be separately deemed to be the vendor, it is clear, that they cannot both together be so considered.

But such sales are always made by an agent; in *England* by a master, in this state by a trustee. Private contracts may be made and executed in person or by attorney; but the attorney is never considered as one of the contracting parties—he exercises no will or power of his own—he is merely the medium or conduit through which the will of the contracting party is expressed. The master or trustee is the mere attorney of the court, acting under a specially delegated authority. And, in no case is a master or trustee authorised more than to accept an offer or proposal to contract, which is of no sort of validity unless it be accepted, ratified and confirmed by the court. It is the court itself, for the benefit of all interested, therefore, who is the vendor in such cases.

But it may be said, if the court be the vendor in sales made by its trustee, would it not also follow, for the same reasons, that a court of common law must be considered as the vendor in

sales made under its writ of *fieri facias* by the sheriff? The cases are essentially different. The writ of *fieri facias* is a general authority or command to the sheriff to make so much money by sale from the personal estate of the defendant. By this writ the executive officer of the court is commissioned to seize the whole, any part, or so much of the defendant's personal estate as may be necessary to raise the specified sum of money. No particular articles of property are ever designated. By the statute this power, given by the common law writ over personal estate, has been extended over real estate. And the same writ, and the same principles of law, now apply to both species of property.

The real or personal estate with which the court of chancery deals is, however, always in one form or other distinctly specified in the proceedings; and the sale is made only, because the court is asked to have it made to accomplish the objects of the suit. In the proceedings at common law, from the commencement, to the *fieri facias*, no property is designated. At common law, the terms and manner of sale are regulated by law; in chancery they are regulated by the court. At common law if the sheriff, in seizing the property and making the sale, conforms to the established regulations applicable to all cases, (and he can sell in no other manner,) the sale is final and valid so soon as it is made. But in chancery the sale is, in no case, binding and conclusive, until it has been expressly approved and ratified by the court. If it be made in a manner wholly different from that prescribed by the court, it may yet be sanctioned; or, if it be made in all respects conformable to directions, it may still be rejected. And hence, it is obvious, that in the one case it is the court of chancery who is the real vendor, and in the other, the sheriff or executive officer of the court.

In an *English* case arising on a sale under the authority of the court of chancery, decided in the year 1721, in which the question was, whether the purchaser should be compelled to complete his purchase or not, this matter is spoken of as one perfectly settled. "Upon a contract betwixt party and party, (says the chancellor,) the contractor would not be decreed to pay an unreasonable price for an estate; so neither ought the

court to be partial to itself, and do more upon a contract *made* *with itself,* or carry that farther, than it would a contract betwixt party and party. On the other hand, the court might be said to have rather a greater power over a contract made with *itself*, than with any *other* " *(a)*. And in other cases, of recent date, where the subject has been brought into view, the court has, in like manner, been spoken of and considered as the vendor.

In a controversy relative to a trustee's sale, under a decree of this court, which was frequently brought before Chancellor *Hanson*, and appears to have been much considered by him, he says, "With respect to sales under the authority of this court, the chancellor thinks himself bound to act as if the property were his own, or held by him in trust. That is to say, he thinks, that reasons which would induce him as proprietor or trustee to set aside a sale made by his agent, should determine him as chancellor to refuse his approbation to a sale made by a trustee." Hence it is evident, that he considered the bidder or purchaser as a contracting party on the one side, dealing with the court as the contracting party on the other, and who was, in fact, the vendor. That the court was to be considered as the *proprietor and principal,* and the trustee as the mere agent, having no right or power whatever, other than as a mere attorney. Hence it is clear upon principle, and also upon authority, as well in *England* as in this state, that the court of chancery, and not its trustee, is in all cases to be considered as the party contracting, or as the real vendor.

The manner of sending property into the market, as well as the mode of sale, generally adopted in this state, differs perhaps, in some particulars, from that of other countries. The form of ordinary sales of merchandize by auction is the same in this state as in *England*. But the mode of making a sale of property under the authority of the court of chancery in *England*, is somewhat different. In such case the estate is sold before one of the Masters in Chancery, who, after the particulars of sale are prepared, corrects and sanctions it by his signature, to authorise the insertion of the advertisement in the Gazette. After which the Master, with the approbation of the parties,

*(a)* *Savile v Savile,* 1 *P. Wms.* 745.

fixes a time of sale; and the second advertisement, (for there are always two,) is then inserted in the Gazette, stating the time of sale.  On the day of sale, a particular of the property or lots to be sold, is prepared under the authority of the Master.  The property or lots successively are put up at a price offered by a person present, and every bidder must sign his name, and the sum he offers, in the space on the particular under the lot for which he bids.  The best bidder is of course declared to be the purchaser—the biddings are closed, and he is reported as such by the Master, to the court; and if the sale be ratified, the contract is complete.  In this state the manner and terms of sale are particularly prescribed in the decree, and the trustee is directed to conform accordingly.  The sale may be directed to be either private or public.  If the latter, it is conducted in the form of an ordinary auction; the bids are received verbally, and the highest bidder is reported as the purchaser, by the trustee.

All the several forms of sale. are, however, mere modal regulations; each of them have their advantages and their inconveniencies; but none of them can in any way materially affect the parties to the contract, or its terms, stipulations, or obligatory force.  The *English* court will not suffer the property to be sold in any manner different from that prescribed before the Master.  In this state these modal regulations are not regarded as of so much importance; and are, therefore, not so strictly adhered to.  If a trustee, who is directed by the decree to sell the tract of land entire, and at public sale, should sell it at private sale and in parcels, or in any other manner different from the mode prescribed, and report satisfactory reasons for doing so, and no objection is made, the sale may be ratified.

But whatever variety or difference may exist as to the mere modality of sale, the intentions and general objects are the same every where, and in all cases.  The benefit of the interested parties, for whom the court makes the sale, is always and chiefly regarded.  The highest price that can be had, under all circumstances, should be obtained; and the sale should be in all respects a fair and honest one.  These are the ends in view.  To attain them, in *England*, if after the biddings are closed, any one else will come in and offer a much higher price, the

biddings will be opened, and the additional offer will be accepted. This phrase of "opening the biddings," which, in the *English* books, occurs so frequently, means no more than a further suspension of the sale, and a continuance of the property in the market. In this state there has been no instance of opening the biddings or suspending the sale merely to let in another and a higher bid, and for no other cause. But in this state, as well as in *England*, if there should be made to appear, either before or after the sale has been ratified, any injurious mistake, misrepresensation or fraud, the biddings will be opened—the reported sale will be rejected, or the order of ratification will be rescinded, and the property again sent into the market and resold.

As to sales under the authority of this court, it has long been well established, that any circumstances showing that the sale was injurious to the parties concerned; or that a better sale might reasonably and probably have been made, is sufficient to prevent a ratification. It is not incumbent on the party objecting to show favouritism, or an improper motive, although such proof would furnish conclusive inducement for rejecting the proposed sale. But where the property of infants was to be sold, even a strong doubt of the propriety of the sale has been deemed sufficient to prevent its ratification. And if, in any case, the trustee reports, that there was an error, mistake, misunderstanding, or misrepresentation, as to the terms or manner of the sale, it will be rejected at once, and a resale ordered without further inquiry. Objections are seldom, or ever made by any others than those directly interested. But the court, in acting as proprietor, or as if the property were its own, and in deciding on the merits of a sale, will avail itself of information from every quarter from which it may be derived; that is, from the original parties to the suit, or the creditors for whose satisfaction the sale is to be made, or from any other person. In such cases, however, much more attention will be paid to objections coming from those who are interested than from volunteers. But it is not unusual, *with the consent of all parties interested,* to ratify the sale immediately on its being reported, without giving any notice, or time for objections to be made by others.

ANDERSON *v* FOULKE.—1828.

Where land has been sold under the authority of this court by the tract or in parcels, containing so many acres "more or less," the sale will not be rejected, unless the deficiency, should it be objected to on that account, be material and considerable. It has been established as the law of the land office, by the proprietary's instructions, as far back as the year 1684, that the words "more or less," in every patent grant, shall be taken to amount to ten *per cent.* over or under, and no more. But in this court, and in relation to private contracts, or to sales under a decree, the words "more or less," added to the statement of the quantity, has never yet been fixed by any decision. Each case appears to have been governed by its own peculiar circumstances. Where the deficiency was material in that part which was the inducement to the purchase, or the like, the sale has been set aside. But where the deficiency has been such as not materially to vary the contract, and the purchaser was still willing to purchase, a proportionable deduction has been made. But where land is sold, not by the tract or in a body, but by the acre, or in lots, at so much per acre; and the alleged number of acres, or the location and description of the lots should not be known or admitted, a survey will be ordered, if required; by which means all difficulties, as to the quantity and location of the land, and the amount of the purchase money, may be entirely removed.

In *England*, it would seem to be usual, in sales under the authority of the court, to offer a good title to the bidders; and hence the references to a Master, at the instance of a party or of the purchaser, of which we read so often, to ascertain whether a good title can be made or not. But in this state it has been always the established law of the court, in such cases, to sell all the right and title of the parties to the suit, whatever that may be, and nothing more. To all judicial sales under orders or decrees of this court, the rule *caveat emptor* has been applied. And, consequently, no examination into the title, after the sale, is necessary or can be called for by the purchaser, whatever may be either its patent or latent defects. But if the trustee makes any promise or representation to the bidder, before the sale, that the estate shall be, or is clear of all incumbrances, or that the title is better or different from that to be

traced from the proceedings, and any such claims should afterwards appear, or be set up, the sale will be annulled. But this relief would be granted to the purchaser on the ground of misrepresentation or fraud, and not on that of a mere defect of title, as in cases between party and party.

After a sale has been ratified, the court, in *England*, will not rescind the order and open the biddings without strong inducements. So in this state, after a sale has been made and reported, and before it has been ratified, it is open to all objections. And, if objected to, unless it should, on examination, turn out to be in all respects fair and proper, it will not be ratified. But, after it has been confirmed, the purchaser can only obtain relief by bill or petition; and thus calling the litigating parties to the suit again before the court to answer, repel, and remove the objections, which he may so make, if they can.

It is usual, in *England*, at the time of bidding, or having the biddings opened to be let in as a higher bidder, for the proffering purchaser to make a deposite of a considerable amount of the purchase money by way of earnest. And this deposite is sometimes said to be the only hold which the court has upon the purchaser; and it is, in truth, the only hold which it can have of him in that stage of the proceedings; for he cannot be quickened before the report is confirmed absolutely. And should he turn out to be insolvent, it is the only effectual hold the court will ever be able to take of him. Consequently, the exacting of a deposite from the purchaser is there considered as a useful and proper precaution. If the purchaser refuses to comply with his contract, the court will, if required by a party interested, inquire whether he is able to pay; and if it should appear that he is insolvent, or has not the means of complying with his contract, the sale will be annulled, the deposite forfeited, and a resale ordered. For even at common law, and between party and party, if, after being requested, the vendee does not, within a convenient time, come and pay for and take away the goods purchased, *the agreement will be dissolved*, and the vendor at liberty to sell them again to any other person. If, however, the purchaser is able, and fails to comply, the court will not suffer itself to be baffled, but will, at the instance of a party interested, compel the purchaser to comply by process of attachment for contempt.

The exercise of a similar summary power of coercion by this court against a tardy or unwilling purchaser after the confirmation of the sale, it has been repeatedly and strongly urged, is one which is not within the scope of its jurisdiction. The exercise of such an authority, it has been urged, is a very recent, and equivocal extension of the power of the court of chancery of *England*. It sometimes has happened, that a necessary and important power, after having been called into action and producing all the beneficial effects required or expected, is suffered to slumber so long as to drop almost into oblivion. Such, it would seem, has been, in some degree, the fate, both in *England* and in this state, of this power of coercing a purchaser under a decree, to comply with his purchase.

In the year 1721, the court of chancery of *England*, was pressed by a party interested to force a purchaser under a decree, to complete his purchase, and not to let him off by a mere forfeiture of his deposite, although it amounted to nearly one tenth part of the purchase money. It was not even intimated, that the court had not the power to do so. But it would seem, that in that case, the purchase was made at a time when the nation was under a general delusion as to the quantity of money in circulation, and the value of property, and the purchaser had been thus induced to give an unreasonably high price for the property in question. The chancellor, without expressing the least doubt as to his power to use coercion in a summary way against the purchaser, or saying any thing distinctly upon that point, said that it was punishment enough if the purchaser was made to lose his deposite, and satisfaction enough to the seller if he was to have the benefit of keeping it *(a.)* Hence it may be inferred, that the court considered itself as having the power to proceed against the purchaser, but that it did not think proper to do so in that case.

One of the most accurate of the *English* reporters gives us the following as the words of Lord *Hardwicke,* delivered in the year 1748, in relation to this subject: "The present, says he, is a judicial sale of the estate, which takes it entirely out of the statute (of Frauds.) The order of the court was not interlocutory, but made part of the decree; as it always is on

*(a.)* Savile *v* Savile, 1 P. Wms. 745.

the matter reserved, though made at another day; and it includes, as well the carrying the purchase into execution, as the establishment of the charity; amounting to a decree for the conveyance of the estate on one side, and payment of the money on the other; *who might be prosecuted for a contempt in not obeying that order.* And it is stronger than the common case of purchasers before the Master, who are certainly out of the statute; *nor should I doubt the carrying into execution against the representative, a purchase by a bidder before the Master without subscribing, after confirmation of the Master's report, that he was the best purchaser;* the judgment of the court taking it out of the statute. But even in common cases this question may arise; as if the authority of an agent, who subscribed for the bidder, not being admitted, cannot be proved. Yet if the Master's report could be confirmed, it should be carried into execution, unless some fraud; for this is all exclusive of any defence that may still be set up on the other side." *(a.)*

In this case the testator had bequeathed a certain sum of money to be invested for charitable purposes, and on a reference to the Master to propose a scheme of investment, he had reported, that the money should be laid out in the purchase of certain lands. The report had been confirmed, and the object now was to obtain *a specific performance of the order confirming the Master's report.* As to which point Lord *Hardwicke* is reported to have said, "the material consideration is, whether, as circumstances now stand, considering the events and alteration of rights thereby, the court ought to carry it into execution? The general rule certainly *is,* that this is discretionary in the court, but will not hold in the present; for that is generally in cases, where there may be an election of two remedies, by coming here for a specific performance, or by action at law; *whereas here there can be no remedy at law; all arising under the acts of this court, from that order amounting to a decree.* So that if this court does not carry it into execution, it cannot be at all; yet whether other remedy or not, if there are strong and material objections against it, the court ought not to do it."

*(a)* *Attorney-General v Day,* 1 *Ves.* 218.

Hence it appears to have been the decided opinion of Lord *Hardwicke,* long before our revolution, not only that a purchaser, after the sale had been ratified, might be compelled to pay the purchase money by process of attachment for contempt; but there was in fact no other remedy, since it was clear, that no action at common law could be maintained against the purchaser grounded merely on the order in chancery confirming the sale.    And this case was cited by Lord *Eldon* in 1805 with approbation, as being entirely sound in its principles *(a.)*

A doubt was expressed upon this subject in a case on the equity side of the court of exchequer in the year 1793, when, on the court being referred to a similar proceeding in chancery which had taken place in the year 1787, an order was made, after confirmation of the sale, that the purchaser should be compelled to complete his purchase *(b.)*    But in the year 1808, the instances in which the court of chancery had exercised such a power seems to have been again almost forgotten.    The chancellor expressed some doubt, but on being referred to a case which arose in the year 1791, he made the order, that the purchaser should pay in his purchase money within a fortnight, or stand committed; observing, that the principle required it equally in the case of a purchaser, who could not be permitted to baffle the court, and disobey an order, more than any other person *(c.)*

From these authorities it appears to have been the settled law of the *English* court of chancery long before, and ever since our revolution, that on a purchaser's failing to comply, the court would, on application, after the ratification of the sale, compel him to complete his purchase by process of attachment for contempt.

But it has happened in this state as in *England,* that the evidence of the existence of this power, so important and so necessary to the jurisdiction of the court of chancery, has been many times almost forgotten, and the propriety of the power itself has been as often doubted or opposed.    There is no instance in this state of a deposite ever having been exacted of a

*(a)* Ex parte Minor, 11 *Ves.* 562.
*(b)* Cunningham v Williams, 2 *Anstr.* 344.
*(c)* Lansdown v Elderton, 14 *Ves.* 512.

bidder before the ratification of the sale; and, therefore, if a purchaser cannot be coerced by process of attachment, this court has no hold of him; nor can it ever take hold of him, in any manner, so as to prevent him from making a mere sport of its decrees.

Some five and twenty years ago, it happened, that a purchaser under a decree of this court became a bankrupt; and the solicitor, under an impression that relief could only be had by a regular suit, brought a bill in which it is stated, that the land was sold on a credit, and bonds taken of the purchaser, with a surety, to secure the purchase money; that the bonds were, by order of this court, assigned by the trustee to the complainant; that the purchaser had been regularly declared a bankrupt; that the surety was insolvent. The purchaser and his assignee only were made defendants. The bill prayed, that the sale might be annulled, that the bonds might be cancelled, and for general relief. The assignee answered and admitted the facts, and the bill was taken *pro confesso* against the purchaser. Upon which the chancellor in his decree of the 7th of July 1808, concisely observes, that, "although the complainant *might obtain relief in another way*, and the neglect or refusal to pay money due for property sold is not alone a sufficient ground to set aside a sale;" yet considering the circumstances of that case, the sale was annulled and the bonds cancelled as prayed. In this respect, there are but two modes of proceeding in chancery, the *regular* and the *summary way*. The *other way* of which the chancellor speaks, in this *regular* case by bill, must, therefore, be understood to mean the *summary way* by petition for process of attachment against the purchaser, or *for a resale grounded on the equitable lien;* which latter must have been that *other way* particularly alluded to. For, he certainly could not have alluded to an action at common law on the bond against this bankrupt purchaser, and his insolvent surety.

In the year 1821 a case occurred in this court in which the party interested applied for, and actually obtained relief in that *other way*, alluded to, as it is believed by the chancellor in his decree of 1808. After the ratification of the sale, the purchaser had neglected and refused to pay the purchase money. Upon a petition of the trustee representing the fact, the court passed

an order commanding the purchaser to pay by an appointed day or show cause, or on default an attachment would be ordered. The party made default, and an attachment was ordered. After which the money was paid.

The defence of this purchaser, in this case, is that the parties can only obtain redress by bill in equity or a suit at law. He has already by petition prayed relief of this court; and after having obtained its decision in that form, and had that decision submitted to the revision of the court in the last resort, it surely ought not to be expected, that these tribunals would again consider and adjudicate upon that cause of controversy if presented in a new shape, and merely put into the form of a suit by bill. The jurisdiction of this court over this matter was as extensively and beneficially exercised on its being presented by petition as it could have been in any other way; and the mode by petition is certainly the most usual and proper, if not the only one in which it ought to have been presented.

In this case every objection which this purchaser chose to make, and, no doubt, every one which he thought could be made, with any degree of plausibility, against the ratification of this sale, has been made, fully and maturely investigated, considered and decided upon. And, after all, the sale has been ratified by this court, and that judgment affirmed by the court of appeals. The contract between this court and this purchaser is, therefore, now absolute, complete, and of record. But now, in answer to an order calling on him to pay the purchase money, he says, that relief, or the means of forcing him to pay, can only be obtained by bill in equity, or a suit at law. A bill in equity in this court would only be going over the same ground, that has already been gone over. It would be an idle repetition, an unnecessary and improper proceeding; and, therefore, cannot be allowed. This purchaser stands charged by the record and proceedings, now here, as the debtor of this court, for the benefit of certain of its suitors, to a certain amount upon a judicial sale and contract that has been duly investigated, and absolutely ratified and confirmed.

But it is said a suit at law must be brought upon this contract. By whom must it be brought? Was a suit at law, grounded merely upon an order in chancery ratifying a sale made under

a decree, ever before heard of either in this state, or in *England?* Lord *Hardwicke,* as we have seen, has expressly declared, that there can be no remedy at law where all the contract arises out of the acts of the court amounting to a decree. But this court is to be regarded as the vendor; and as no bond or note has been taken from this purchaser, which could enable *the parties interested* to put their claim against him into the common law form and modality of an action at law, how, or in what manner is such a suit to be brought? Must they bring an action of debt, of *assumpsit,* or a special action on the case?

In all cases of this sort, where property has been sold to pay debts, or for other purposes, and no bonds or notes are taken, there seems to be an insuperable difficulty in making proper parties to try the right at law to the whole purchase money, or to any dividend of the proceeds, either as against the purchaser, or any one or more of the litigating parties to the suit in equity. The powers of the trustee, if he takes no bonds or notes, cease with the ratification of the sale, as to all the purposes of a suit at law. The decree clothes him with no power to sue at law; and, if it did, or this court were specially to direct him to sue, it must put into his hands the cause of action, the evidence of the debt, with its own order. The action must then be grounded upon an order of this court, and instituted in the name of its agent. It would be as if *one court* were to bring suit upon its own judgment in *another court.* Could such an action be sustained? I conceive it could not.

Chancellor *Hanson,* in an order of the 2d of May 1803, in speaking of a contest between suing creditors about a dividend of the proceeds of their deceased debtor's estate, says, "he had never thought it necessary in case of any disputed claim to send out an issue, or to refer the party to an action at law. *Indeed it would be difficult, in most cases, to ascertain the proper parties for an issue.* The executor or administrator surely would not be compelled, without being a party, to act as defendant on the trial of the issue. However, in all cases where a claim depends on a single fact or facts strongly litigated, and of difficult investigation, the chancellor conceives, *that in some manner an issue ought to be tried.*" The chancellor may control the parties to the suit in equity, so as to compel them

to submit to the trial of an issue at law in any form he may dictate. But, if a purchaser cannot be proceeded against here, he certainly cannot be controled at law. Upon the whole, it seems to me clear, that there can be no remedy against a purchaser at law independently of his bonds.

It seems to be an opinion of some, that there was a distinction between sales for ready money, and sales on credit where bonds or notes were given for the purchase money. But, as regards the purchaser it is difficult to conceive how his liability, and the nature of his obligation, can be substantially varied by the single circumstance of the purchase money having been made payable on the day of the ratification of the sale, or one day, or one month, or one year, after that day.

When the term of credit has expired, and the purchase money is actually due and demandable, it would seem necessarily to follow, that the payment may be enforced as in all other cases—by any form of legal or equitable proceeding by which compliance with such a contract might be enforced. And if the process of attachment might have been used to enforce a compliance, if payment had been stipulated to be made on the day of the ratification, it certainly might be used for the same purpose, at any time after when the money became due; because such a mode of proceeding grows out of, and is incident to the nature of the contract between the court and the purchaser, and cannot be affected by any stipulation as to the mere time of payment. It is a mode of proceeding necessarily incident to such a contract; because every particular of it is a matter of record; and that too, in a court peculiarly fitted and competent to relieve against any accident, mistake or fraud, that has happened or may be discovered. Such a contract is not within the statute of frauds; and there is nothing left open for litigation or trial before another tribunal, or even before this court, which cannot be fully and satisfactorily inquired into and determined in the most summary way. The form and nature of the contract precludes controversy, and supersedes all trial. There is, however, one, and but one question arising out of it left open, and that is, whether or not the money has been paid as stipulated?

But when a sale has been made on a credit, and bonds have been taken to secure the purchase money, it has long been the established practice, after the day of payment has elapsed, to sue upon the bonds; which shows, as it is said, that they alone are looked to, and that all other modes of proceeding have been tacitly waived. But the bonds, in such cases, are intended only as an accumulation of the security, or as an additional assurance. And it would be contrary to all the analogies of the law to construe the taking of one security into an abandonment of another, where there was no incompatibility in the existence of both of them together.

Thus it has been held, that although the statute requires the party who sues out a commission of bankruptcy to give bond, with surety, to answer to the party who may be injured thereby, it does not deprive the party injured of any remedy at common law, other than upon the bond. He can, it is certain, have no more than one satisfaction for the injury, but to obtain that he may sue either at common law on the special circumstances, or upon the bond. So the importer of merchandize becomes thereby a debtor to the government for the amount of duties imposed by the act of congress. But the law indulges the importer with a credit, on his giving bond for the duties; yet the giving, or not giving a bond, does not supersede the right of action which accrues to the government by operation of law on the importation. The government may sue the importer on such legal liability, considering him as its debtor, or it may sue upon the bond, if one has been given. They are considered as two assurances, affording two remedies, or modes of obtaining one satisfaction. So also a receiver, appointed by the court of chancery, is always required to give bond, with surety, to account. But in such case the court may either proceed by attachment against the receiver alone, or upon the bond.

In all these, and other like cases, the existence of the two securities, and the two remedies, being perfectly compatible, the one with the other, it has never been held that the taking of one amounts to a tacit waiver of the other. And, consequently, the taking of bonds or notes with or without surety, of a purchaser under a decree, cannot, in any case, be construed as an abandonment of the right to proceed against the purchaser

alone, by attachment, to enforce the payment of the purchase money, after it has become due, and after the sale has been ratified.

But if the parties choose, as they may, to have the bonds or notes, which have been taken of the purchaser, assigned to them in satisfaction of their claims that have been established; or to have the trustee directed to proceed against the purchaser, and his sureties, in order to fix their liability upon them by a judgment at law, and in that way to recover the purchase money; suits may be brought upon the bonds or notes by the assignee or the trustee, according to the uniform and long established course, where such has been the choice and object of the parties.

It is a clear and well settled principle of this court, that where property has been sold under a decree, the court, as the vendor for the benefit of those interested, retains an equitable lien for the payment of the purchase money. The most usual way of enforcing this lien has been by petition of a party interested setting forth the facts, and praying that the property may be resold to pay the whole or balance of the purchase money. And a sale will be ordered accordingly at the risk of the purchaser. The proceedings, in such cases, are almost always informal and summary. The vendor under a decree, therefore, holds two securities for the payment of the purchase money; one is *this equitable lien,* and the other is *the personal liability* of the purchaser. It is conceded on all hands, that the equitable lien may be enforced in a summary way. Can there then be any conceivable solid reason why the personal liability should not also be enforced in a summary way? If it could not, there would be a gross incongruity in the rules of the court. But it is not so; the personal liability may be enforced in a summary way, and there is a perfect harmony in the rules and principles of the court.

Upon the whole, it is my opinion, that the purchase money of property sold under a decree, after the sale has been ratified, may be recovered, either by an order and process of attachment of contempt against the purchaser himself, to compel him to complete his purchase after the purchase money has become due; or by a resale of the property, grounded on the subsisting

equitable lien; or by an action at law against the purchaser, and his sureties, upon the bonds or notes given by them for the payment of the purchase money. *Ordered*, that no good cause having been shown against the order of this court of the 17th of March last, the same is confirmed and made absolute: Also *ordered*, that an attachment issue against the said *Samuel Anderson* to enforce obedience to the said order, returnable to the next term of the court.

From which order *Anderson* appealed to this court.

The case was argued before BUCHANAN, Ch. J. and EARLE, MARTIN, STEPHEN, and ARCHER, J.

*S. Pinkney*, and *Magruder*, for the Appellant, contended, 1. That as he never was reported to the court as the purchaser of the property, he cannot be compelled to complete the contract mentioned in the case.

2. That a good title cannot be conveyed to him in consequence of the irregularity of the proceedings in the original cause.

3. That the court of chancery has no power by a summary proceeding to compel a purchaser from a trustee under its decree to complete his purchase

4. That the property being in the possession of a third person, and the trustee unable to give possession, the purchaser was not obliged to perform his contract until the trustee was prepared to deliver possession.

5. That the contract should have been annulled in consequence of the purchaser's inability to comply with the terms of sale.

6. That the sum of money to be paid for the land never has been ascertained. It was a sale at $11 per acre, and the quantity never ascertained, which must be done, before any process, in the nature of an execution, can be issued.

In their argument they cited *Savile v Savile*, 1 *P. Wms.* 745. *Attorney-General v Day*, 1 *Ves.* 218. *Cunningham v Williams*, 2 *Anstr.* 345. *Lansdown v Elderton*, 14 *Ves.* 512. *Snowden v Journey*, per *Johnson*, Chan. *Pinkney, (trustee,) v Munroe*, per *Johnson*, Chan. *Morton v Tongue*, 6 *Harr.*

*&* *Johns.* 23.    *Sugd. Ch.* 2.    *Brasher's Ex'rs. v Cortlandt,* 2 *Johns. Ch. Rep.* 506.

*Boyle,* for the Appellee, cited 1 *Newl. Ch Pr.* 334, 336, 337. The acts of 1785, *ch.* 72, *s.* 22, 34; and 1818, *ch.* 193, *s.* 4; and *Brasher's Ex'rs. v Cortlandt,* 2 *Johns. Ch. Rep.* 505.

STEPHEN, J. delivered the opinion of the court. On the 13th of January 1826, *Asher Foulke,* the appellee in this cause, filed his petition against the appellant in the court of chancery, in which he stated, that on or about the 26th of February 1822, a certain *George Andrews* and *Ennion Williams,* filed their bill of complaint in the court of chancery, in which they stated, that *Andrews* contracted to purchase of *Williams* part of a tract of land in *Anne-Arundel* county, called *Duvall's Delight,* for $2,100, which sum, it was admitted, was paid by *Andrews* to *Williams* That *Andrews* contracted to sell the said land to a certain *Stephen Scotton* for the said sum, who paid a part thereof, and gave his single bill for the balance; that other payments had been made, leaving a considerable balance due; that *Scotton* was dead, intestate; that his personal estate was insufficient to pay his debts, and prayed that a decree might pass for the sale of the said land, or such part thereof as would satisfy the debts of the intestate. That on the coming in of the answer of the respondents, the chancellor passed a decree for the sale of the land, by which decree, the petitioner states, he was appointed trustee to make said sale; that *Anderson,* the appellee, became the purchaser for eleven dollars per acre; that he reported his said sale to the chancellor; that the appellant filed his objections to the ratification of the sale, which were overruled by the chancellor, and the sale ratified and confirmed. That from the chancellor's order of ratification, the appellant appealed to this court; and that this court, on the 16th of July 1826, affirmed the order of chancellor. That the appellant was served with a copy of the judgment of this court, affirming the chancellor's order of ratification, and requested him to pay the purchase money, which he refused to do. The petition then prayed an attachment of contempt against the appellant, and an order that he be committed to prison until he completes his purchase by paying the purchase money. In this petition

.the proceedings are referred to and made part thereof, showing the ratification of the sale by the chancellor, and the affirmance of the same by this court.

On the 17th of March 1826, the chancellor passed an order that the appellant pay to the appellee, or bring into that court, the amount of the purchase money, with interest, on the 17th of April then next, or show good cause to the contrary; provided a copy of that order, together with the petition of the appellee, be served on the appellant, on or before the 25th of that month. On the service of this order on the appellant, and on noncompliance with its requirement, the chancellor, on the 12th of May 1826, after hearing the parties by their counsel, passed the following order: "*Ordered,* on this 12th of May 1826, that, no good cause having been shown against the order of this court of the 17th day of March last, the same is hereby confirmed and made absolute. And it is further ordered, that an attachment issue against the said *Samuel Anderson,* to enforce obedience to the said order, returnable to the next term of this court." From this order, the appellant appealed to this court; and upon its merits and propriety this court is now called upon to decide. It appears from the proceedings in this case, that on the sale made by the appellee to the appellant being reported to the chancellor, objections to its ratification were filed by the appellant, and answered by the appellee, on full consideration of which, the sale was ratified, and that ratification affirmed by this court; it is, therefore, not competent for the appellant now to contest the propriety or validity of that sale, it having received the sanction of the highest judicial authority of this state. But it has been contended, that as the appellant never was reported to the court as the purchaser of the property sold by the appellee, he cannot be compelled to complete the purchase, by paying the purchase money. It does not appear, it is true, that the trustee in this case has proceeded according to the usual practice of the court, in making a formal report of his sale; but it appears by the proceedings, that on the 9th of October 1822, the appellant filed his petition to the chancellor, in which he stated that he had contracted with the appellee for the purchase of the land in question, supposed to contain 140 acres, at and for the sum of eleven dollars per acre, and by the

report of the trustee, (the appellee,) was returned the purchaser, and prayed that the sale made and reported might not be confirmed.    On the coming in of the answer of the appellee, and the return of depositions which were taken in pursuance of the chancellor's order, and upon the return of the locations made by the sheriff of the county under the same authority, the chancellor passed an order ratifying and confirming the sale, which order, on appeal, received the sanction of this court. It is, therefore, now too late for the appellant to object that he was not reported in the more formal and usual way, to the court of chancery, as the purchaser of the property.  The trustee, moreover, in answering the petition of the appellant against the ratification of the sale, refers to and makes a part of his answer, the written contract of sale to the appellant, executed by both the appellant and appellee, which mentions fully the terms of sale, and which is understood to be the sale ratified by the chancellor.   Under this view of the subject this court are of opinion, that there is nothing in the objection that the appellant was not reported to the court as the purchaser of the property, and that a good title cannot be conveyed to him in consequence of this irregularity in the proceedings.

It has been contended that the court of chancery has no power, by a summary proceeding to compel a purchaser at a trustee's sale, made under the authority of its decree, to complete his purchase by enforcing the payment of the purchase money. This objection, it is conceived, cannot be available in the case now under consideration.    The trustee did not take either notes or bonds for the payment of the purchase money, upon which a suit or suits at law could have been instituted, but relied solely upon the liability of the purchaser arising from the contract of sale, which was not binding upon either party until ratified by the chancellor; but when ratified, it was his duty to pay the purchase money, or show good cause to the contrary.   Neither of which has he done in the present case; for neither the allegation of the trustee's inability to comply with the terms of the sale, nor that the property, being in the possession of a third person, the trustee was unable to deliver him possession, is not supported by a shadow of proof. Had the chancellor, therefore, under the circumstances of this case, a right to adopt the

proceeding to which he resorted to compel the payment of the purchase money? We think he had. The order of the chancellor was, that *Samuel Anderson*, the purchaser, should pay the money to the trustee, or bring the same into court on a particular day, or show good cause to the contrary. Under the terms of this order, it is not perceived why *Anderson* could not have made as full a defence, and have availed himself of all the objections, which could have been relied upon, in case an original bill had been filed against him to enforce the same object. Upon application to the chancellor, setting forth that testimony would be essential to his defence, on the hearing of the order, the chancellor would have passed an order to enable him to obtain it, upon the return of which a full hearing of the merits of the case might have been had, and if equity and justice required it, he would and ought to have been discharged from his purchase. That the court of chancery in *England* has the power of compelling a purchaser to pay his purchase money after the confirmation of the sale, by an order for that purpose, is not to be doubted. *Lansdown v Elderton,* 14 *Ves.* 512 *Newland Ch. Pr.* 336. In *Brasher's Ex'rs. v Cortlandt,* 2 *Johns. Ch. Rep.* 506, 7, it appears, that by the practice of the court of chancery in *New-York,* a purchaser may be compelled to complete his purchase; and Chancellor *Kent* in that case is reported to have said, "I have no doubt the court may, in its discretion, do it in every case where the previous conditions of the sale, have not given the purchaser an alternative."

In this case it is quite apparent that the procrastination and delay are the objects of the purchaser, as he has taken every measure in his power to prevent the ratification of the sale; and after the sale was ratified, on appeal to this court, has still refused to pay the purchase money, and has driven the trustee to resort to the compulsory power of the court of chancery to coerce payment. Under these circumstances, we think it a fit case for the exercise of such a power by that court; although it is not intended at present to establish any general rule on the subject. There is nothing in the objection that the quantity of land sold has not been sufficiently ascertained.

ORDER AFFIRMED.